UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

THE ANNUITY, PENSION, WELFARE AND
TRAINING FUNDS OF THE INTERNATIONAL
UNION OF OPERATING ENGINEERS, LOCAL
14-14B, AFL-CIO *by their trustees* EDWIN L.
CHRISTIAN, CHRIS CONFREY, JOHN
CRONIN, DON DENARDO, KENNETH
KLEMENS, JOHN F. O'HAIRE, DENISE M.
RICHARDSON and ERNESTO TERSIGNI,

**MEMORANDUM & ORDER**
15-CV-543 (MKB)

                Plaintiffs,

        v.

SUPERIOR SITE WORK, INC.,

                Defendant.

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

Plaintiffs Edwin L. Christian, Chris Confrey, John Cronin, Don Denardo, Kenneth

Klemens, John F. O'Haire, Denise M. Richardson and Ernesto Tersigni are trustees of the

Annuity, Pension, Welfare and Training Funds of the International Union of Operating

Engineers, Local 14-14B, AFL-CIO (collectively, the "Local 14 Trust Funds") who commenced

this action on February 4, 2015, against construction company Superior Site Work, Inc. under

sections 502 and 515 of the Employee Retirement Income Security Act of 1974, *as amended*, 29

U.S.C. §§ 1132(a)(3) & 1145 ("ERISA"), and section 301 of the Labor Management Relations

Act of 1947, 29 U.S.C. § 185 ("LMRA").  (Compl. ¶¶ 1–2, Docket Entry No. 1.)  Plaintiffs seek

to recover fringe benefit contributions owed to employee trust funds and statutory damages for

an alleged breach of a collective bargaining agreement.  (*Id.*)  Based on additional information

received during discovery, Plaintiffs filed an Amended Complaint on May 26, 2015 requesting additional contributions. (Am. Compl., Docket Entry No. 12.)

On April 5, 2016, Plaintiffs moved for summary judgment seeking a judgment in the amount of $177,636.80, consisting of a principal deficiency of $153,587.90, interest of $7760.15, and attorneys' fees and costs of $15,793.75 and $495.00, respectively, plus additional interest and statutory damages in amounts to be determined. (Pls. Mot. for Summ. J. ("Pls. Mot."), Docket Entry No. 25; Statement of Damages at 1, annexed to Pls. Mot. as Ex. 1.) Despite conferring with Plaintiffs on a briefing schedule and taking part in settlement negotiations as late as February of 2016, Defendant has not opposed Plaintiffs' motion for summary judgment and appears to have stopped defending this action. (*See* Joint Mot. for Extension of Time, Docket Entry No. 24.) For the reasons discussed below, the Court grants Plaintiffs' motion for summary judgment.[1]

## I. Background

The Local 14 Trust Funds are multi-employer benefit plans and third-party beneficiaries to a collective bargaining agreement ("CBA") between Defendant and Local 14-14B International Union of Operating Engineers ("Local 14").[2] (Pls. Statement of Undisputed Facts Pursuant to Local R. 56.1 ("Pls. 56.1") ¶¶ 3, 5, Docket Entry No. 26.) The CBA was signed on

---

[1] Plaintiffs also moved pursuant to Rules 37(b) and 37(c)(1) of the Federal Rules of Civil Procedure for an order precluding Defendant from offering any evidence in opposition to the motion for summary judgment or at trial as a result of Defendant's failure to adhere to the Court's scheduling orders. (*See* Pls. Mot.) Because the Court grants Plaintiffs' motion for summary judgment and Defendant has not offered any evidence, Plaintiffs' motion to preclude is denied as moot.

[2] Local 14 is a union that represents operating engineers who work throughout the five boroughs of New York City. (Pls. 56.1 ¶¶ 4, 8.)

September 13, 2006, has no expiration date and has not been voided by the parties. (*Id.* ¶ 5; CBA, annexed to Affidavit of James M. Steinberg in Supp. of Pls. Mot. ("Steinberg Aff.") as Ex. A, Docket Entry No. 27.) The CBA provides the terms and conditions of employment for Defendant's employees, who perform "heavy construction work" within the jurisdiction of Local 14. (Pls. 56.1 ¶ 7; CBA ¶¶ 1, 6.) By its terms, the CBA also incorporates certain other agreements that Local 14 negotiated with employers' associations, including an agreement between Local 14 and the General Contractors Association of New York (the "GCA") that defines the obligations of heavy construction employers. (Pls. 56.1 ¶ 9; 2010–2014 GCA Contract, annexed to Steinberg Aff. as Ex. B; 2014–2018 GCA Contract, annexed to Steinberg Aff. as Ex. C.) Because Defendant performs heavy construction work, it is bound by the terms of Local 14's contracts with the GCA governing heavy construction employers' obligations (the "GCA Contracts"). (Pls. 56.1 ¶ 10; 2010–2014 GCA Contract at 4; 2014–2018 GCA Contract at 5.) The GCA Contracts provide that employers like Defendant must make contributions to the Local 14 Trust Funds on behalf of their employees who perform work covered by the GCA Contracts. (CBA ¶ 5; 2010–2014 GCA Contract at 71–76; 2014–2018 GCA Contract at 108–14.) In order to make contributions to the Local 14 Trust Funds, employers like Defendant are required to purchase and distribute "fringe benefit stamps"[3] to their employees from the Local 14

---

[3] In order to track benefit contributions, Local 14, like many unions, uses a stamp plan that requires Defendant and other employers to purchase stamps from the union or another authorized institution in an amount equal to the benefits owed to the Local 14 Trust Funds. *See N.Y.C. Dist. Council of Carpenters Pension Fund v. Quantum Constr.*, No. 06-CV-13150, 2008 WL 5159777, at *5 (S.D.N.Y. Dec. 9, 2008) (explaining unions' stamp systems). Employees receive the stamps from the employer in connection with their weekly pay as proof that the employer made the required contribution to the Local 14 Trust Funds. Employees redeem the

Trust Funds in proportion to the number of eligible hours their employees work. (Pls. 56.1 ¶ 12; CBA ¶ 5; Affidavit of Marlene Monterroso in Supp. of Pls. Mot. ("Monterroso Aff.") ¶ 2, Docket Entry No. 29.) Defendant is also required to make its books and records available to the Local 14 Trust Funds for audit of those contributions. (CBA ¶ 4.)

On or about November 18, 2014, Plaintiffs and their certified public accounting firm conducted an audit of Defendant's books and records. (Affidavit of Lisa Madeiras in Supp. of Pls. Mot. ("Madeiras Aff.") ¶ 3, Docket Entry No. 30.) The audit covered Defendant's payroll records from July 1, 2011 through December 7, 2014. (*Id.*) The initial audit report identified a deficiency of $162,750.17 in the amount due and owing to Local 14 Trust Funds.[4] (*Id.* ¶ 4; Pls. 56.1 ¶ 21.) Based on the initial report, Plaintiffs filed the instant suit. (Madeiras Aff. ¶ 4; Pls. 56.1 ¶¶ 16, 17.) On February 13, 2015, one of Defendant's employees contacted the auditor with two objections to the initial report. First, the employee objected to the deficiency calculated on behalf of employee Perry Notarnicola as understating the amount owed because Defendant had provided Notarnicola with "straight" stamps, reflecting regular hours worked, instead of the

---

stamps for benefits, and the Local 14 Trust Funds track the stamps that are purchased and redeemed via a serial number on each stamp. *See generally id.*

[4] In brief, the auditors used Defendant's payroll records to calculate the total payroll hours worked in "straight time" and "double time" (overtime) worked by employees covered by the CBA. (Monterroso Aff. ¶¶ 7–9.) The auditors deducted from the total payroll hours the amount in fringe benefit stamps redeemed by the employees, and then reviewed the stamp purchase history reports for the relevant time periods to determine if Defendant had purchased stamps that had not been redeemed, for which it would be owed credit. (*Id.*) There were no unredeemed stamps, and Defendant was therefore not entitled to any credit. (*Id.*) The auditors then multiplied the total deficiency hours by the applicable regular and double-time fringe benefit rates to calculate the fringe benefit deficiency. (*Id.*) The CBA's applicable interest rate of six percent was applied to the deficiency through the date of the audit report to reach the "Total Fringe Benefit Deficiency" for the contract period. (*Id.*)

"double" stamps reflecting the overtime hours Notarnicola actually worked. (Madeiras Aff. ¶ 4; Email from Susan Caruso dated Feb. 13, 2015 ("Caruso Email"), annexed to Steinberg Aff. as Ex. J.) Second, Defendant's employee objected to the deficiency calculated on behalf of employee Joaquim Batista, a member of the affiliated Local 138 in Long Island, which should not have been included because Batista had not operated heavy construction equipment during the audit period. (*Id.*)

The Local 14 Trust Funds requested that Defendant produce a contribution history report from the Local 138 Trust Funds, Batista's home funds, or other independent documentation to support Defendant's position that Batista had not operated heavy construction equipment despite having received and redeemed stamps from Defendant during that period.[5] (Pls. 56.1 ¶ 33; Caruso Email; *see* Steinberg Aff. ¶ 4.) Defendant did not respond or provide any further information, and the audit report was revised to reflect only Notarnicola's additional hours. (Pls. 56.1 ¶ 34; Madeiras Aff. ¶ 4; Revised Audit Report dated Apr. 16, 2015 ("Revised Report"), annexed to Steinberg Aff. as Ex. L.) The Revised Report identified a deficiency of $164,202.46, the amount included in the Amended Complaint. (Revised Report; *see also* Am. Compl. ¶ 26.)

On June 2, 2015, Plaintiffs served their initial disclosures on Defendant. (Pls. Initial Disclosures, annexed to Steinberg Aff. as Ex. O.) At a conference held before Magistrate Judge Viktor Pohorelsky on June 17, 2015, Defendant was ordered to "provide initial disclosures within 7 days." (Minute Entry dated June 17, 2015, Docket Entry No. 15.) Defendant never

---

[5] Plaintiffs state that Batista is a member of Local 138, an affiliated local union of operating engineers that has jurisdiction over Nassau and Suffolk Counties. (Monterroso Aff. ¶¶ 10.) When Batista redeemed stamps provided to him by Defendant, Local 14 "reciprocated [their] money value" to the trust funds maintained by Local 138. (*Id.*)

served its initial disclosures.  (Steinberg Aff. ¶ 6.)  Plaintiffs attempted, but were unable, to informally gather additional information from Defendant to support the alleged discrepancy regarding Batista's hours.  (*Id.* ¶ 7.)  Accordingly, Plaintiffs served their first set of discovery requests on August 10, 2015.  (Pls. Interrogs., annexed to Steinberg Aff. as Ex. Q; Pls. Req. for Prod., annexed to Steinberg Aff. as Ex. R.)  The requests included a demand for further information to support Defendant's objection to the audit results as to Batista's hours.  (*Id.*; Steinberg Aff. ¶ 7.)  At a status conference held on September 9, 2015, Judge Pohorelsky ordered Defendant to respond to Plaintiffs' discovery requests by September 30, 2015.  (Order dated Sept. 9, 2015, Docket Entry No. 17.)  Judge Pohorelsky advised Defendant that if it failed to respond by the deadline, Plaintiffs would be entitled to "move for such relief as they deem appropriate including the preclusion of evidence."  (*Id.*)  Defendant did not respond to Plaintiffs' discovery requests.  (Pls. 56.1 ¶ 40; Ltr. from Pl. dated Oct. 5, 2015, annexed to Steinberg Aff. as Ex. T.)

In support of their motion for summary judgment, Plaintiffs have submitted a final audit report identifying a deficiency of $161,348.05, which reflects specific amounts owed for ERISA and non-ERISA contributions.  (Affidavit of Edwin L. Christian in Supp. of Pls. Mot. ("Christian Aff.") ¶ 9, Docket Entry No. 28; Final Audit Report dated Dec. 9, 2015 ("Final Report"), annexed to Steinberg Aff. as Ex. V.)  The Final Report reflects an amount that includes six-percent interest on the ERISA funds for welfare, pension, annuity and training;[6] and no interest

---

[6]  The Trust Agreements establishing the Local 14 Trust Funds provide that an employer who fails to pay fringe benefit contributions will pay interest at the rate of six percent (6.0%). (Pls. 56.1 ¶ 41; *see* Trust Agreements at 9–11, annexed to Steinberg Aff. as Exs. D–G.)

on the non-ERISA funds for voluntary annuity (including political action contributions), dues assessment and legal defense.[7]  (Final Report; *see* Madeiras Aff. ¶¶ 2, 10–13 (explaining minor differences between Revised Report and Final Report); Pls. 56.1 ¶¶ 30–32.)  Defendant has not paid any part of the deficiency.  (Pls. 56.1 ¶ 29; Monterroso Aff. ¶ 11.)

## II. Discussion

### a. Standard of review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Davis v. Shah*, 821 F.3d 231, 243 (2d Cir. 2016); *see also Cortes v. MTA NYC Transit*, 802 F.3d 226, 230 (2d Cir. 2015); *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).  The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.  The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment.  *Id.*  The court's function is

---

[7]  The non-ERISA funds include: a voluntary annuity contribution, which is a successor to a type of vacation benefit and includes a fee to fund the union's political action committee; the dues check-off or union assessment, which is an amount allocated by the union membership as supplemental dues; and the union defense fund, which is an allocation for Local 14 to defend lawsuits.  (Monterroso Aff. ¶ 9.)  Because these are non-ERISA contributions, they are not entitled to a claim for interest at the rate provided for ERISA contributions in the Trust Agreements.  (Madeiras Aff. ¶ 12.)

to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

Where, as here, a motion for summary judgment is unopposed, "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001). "Before summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed." *Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014) (citing *Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004)). "In doing so, the court may rely on other evidence in the record even if uncited." *Id.* (citing Fed. R. Civ. P. 56(c)(3)).

### b. Liability under ERISA and the LMRA

Section 515 of ERISA provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. Similarly, the LMRA authorizes federal "[s]uits for violation of contracts between an employer and a labor organization representing employees." *Id.* § 185(a); *see also Brown v. C. Volante Corp.*, 194 F.3d 351, 354 (2d Cir. 1999) (explaining lawsuit for failure to abide by a collective bargaining agreement is governed by 29 U.S.C. § 185(a)).

Here, the facts establish that Defendant failed to make required contributions pursuant to the CBA, violating ERISA. Local 14 and Defendant are parties to a CBA for the period covered

8

by the auditor's report. Pursuant to that CBA and the GCA Contracts, Defendant purchased stamps for work performed by its employees between July 1, 2011 and December 7, 2014. The auditor reviewed Defendant's books and records and discovered that Defendant had failed to purchase the required number of stamps for all hours worked by employees covered under the CBA and GCA Contracts.[8] Plaintiffs, as plan fiduciaries, may bring a civil action to enforce the provisions of the CBA. *See* 29 U.S.C. § 1132(a)(3)(B)(ii) (empowering a fiduciary to enjoin any act or practice in violation of ERISA or to enforce any provisions of the employee plan); *see also Finkel v. Ommega Commc'n Servs., Inc.*, 543 F. Supp. 2d 156, 160 (E.D.N.Y. 2008) (applying same provision). Accordingly, the Court finds that Plaintiffs have met their burden of proving that Defendant violated section 515 of ERISA, as well as the terms of the CBA for which Plaintiffs may seek enforcement under the LMRA. Plaintiffs are therefore entitled to summary judgment.

### c.   Damages

Plaintiffs request that the Court accept their damages calculations and award damages as listed in their Statement of Damages. (Pls. Mem. 17.) Ordinarily, claims for damages must be established in an evidentiary proceeding at which a defendant is afforded an opportunity to

---

[8] It appears that at an early stage in the litigation, Defendant raised a concern about the inclusion of Batista's hours in the deficiency amount. However, in the absence of any evidence from Defendant that Batista did not perform covered work under the CBA and GCA Contracts during the relevant time period, the Court finds that Batista's hours were properly included in the final deficiency owing to Plaintiffs. *See Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 53 (2d Cir. 1993) ("If a particular worker is not covered by the bargaining agreement because of a position in management or for some other reason, it is reasonable to expect the employer to bring forth the correct information in his possession."); *see also Annuity, Welfare & Apprenticeship Skill Improvement & Safety Funds of Int'l Union of Operating Eng'rs, Local 15, 15A, 15C & 15D, AFL-CIO v. Eastport Excavation & Util. Inc.*, 3 F. Supp. 3d 204, 215 (S.D.N.Y. 2014) (explaining burden-shifting after benefit fund has produced evidence that employer's records are inaccurate (collecting cases)).

contest the amount claimed. *See Fustok v. Conticommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989). However, a court may make this determination based upon evidence presented at a hearing or upon a review of detailed affidavits and documentary evidence submitted by the plaintiffs. *See Action S.A. v. March Rich & Co., Inc.*, 951 F.2d 504, 508 (2d Cir. 1991); *Fustok*, 873 F.2d at 40. Here, Defendant has been on notice of the damages Plaintiffs sought since the filing of the Complaint, (Compl. ¶ 25), and it has not disputed Plaintiffs' documentary evidence. The Court will therefore determine damages based on the documentary record before it.

Section 502(g) of ERISA provides that upon finding a violation of section 515, "the court shall award the plan" the following:

> (A) the unpaid contributions,
> (B) interest on the unpaid contributions,
> (C) an amount equal to the greater of—
>> (i) interest on the unpaid contributions, or
>> (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
> (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
> (E) such other legal or equitable relief as the court deems appropriate.
> For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26.

*Id.* § 1132(g). In other words, the "special remedy against employers who are delinquent in meeting their contractual obligations that is created by § 502(g)(2) includes a mandatory award of prejudgment interest plus liquidated damages in an amount at least equal to that interest, as well as attorney's fees and costs." *Int'l Ass'n of Heat & Frost Insulators v. CAC of N.Y., Inc.*,

No. 13-CV-39, 2015 WL 691192, at *2 (S.D.N.Y. Feb. 18, 2015) (quoting *Laborers Health &*

*Welfare Tr. Fund v. Adv. Lightweight Concrete Co., Inc.*, 484 U.S. 539, 547 (1988)).

### i.   Unpaid ERISA and non-ERISA contributions

Plaintiffs seek $120,897.55 in delinquent ERISA contributions and $32,690.35 in

delinquent non-ERISA contributions.  (Statement of Damages at 1.)  As explained above, the

auditors arrived at these sums by taking the number of regular and overtime hours worked by

covered employees during each of the relevant time periods and multiplying those categories of

hours by their respective fringe benefit contribution rates.  (*See* Wage Scales, annexed to

Steinberg Aff. as Ex. H; Final Report at Summary; *see also* Monterroso Aff. ¶¶ 7–9.)  The Court

is satisfied that the evidence substantiates the amount of unpaid principal reflected in the

auditor's Final Report and in Plaintiffs' Statement of Damages.

### ii.   Interest on ERISA deficiency

Plaintiffs also seek interest on unpaid contributions to the ERISA plans.  (Statement of

Damages at 1.)  ERISA provides that interest will be calculated using the rate in the relevant

benefit plan, or if the plan sets no such rate, a prescribed statutory rate.  29 U.S.C. § 1132(g)(2);

26 U.S.C. § 6621.  Under the Trust Agreements establishing the Local 14 Trust Funds, a six-

percent (6%) interest rate applies to late and unpaid ERISA plan contributions.[9]  (*See* Madeiras

Aff. ¶¶ 9, 12; Pls. 56.1 ¶ 41 (citing Trust Agreements at 10–12).)  Applying that rate as of the last

---

[9]  Plaintiffs note that although the Trust Agreements do not provide the period over which the six percent interest rate should be calculated, the interest rate in trust agreements normally accrue on either a monthly or annual basis.  (Pls. Mem. in Supp. of Mot. ("Pls. Mem.") 19, Docket Entry No. 31.)  Here, Plaintiffs have calculated interest on an annual basis, and, in the absence of any objection from Defendant, the Court will apply an annual interest rate of six percent to the ERISA deficiency.

date of each contribution period[10] and through December 15, 2014, the date of the initial audit report, Plaintiffs seek $7760.15 in prejudgment interest on the delinquent ERISA contributions. (Statement of Damages at 1.) Plaintiffs seek an additional amount in prejudgment interest calculated at a rate of six percent from December 16, 2014 through the date of final judgment. (*Id.*) The Court grants Plaintiffs' request for prejudgment interest on delinquent ERISA contributions at a rate of six percent per year from December 16, 2014 through the date of this Memorandum and Order, amounting to an additional $15,759.45.[11] In sum, Plaintiffs are entitled to $23,519.60 in interest on the delinquent ERISA contributions.

### iii. Statutory damages

Plaintiffs request an additional sum equal to the amount of prejudgment interest on the delinquent ERISA contributions. (Pls. Mem. 19.) Under section 502(g)(2) of ERISA, Plaintiffs

---

[10] Plaintiffs have not identified the date from which interest typically accrues on unpaid or late contributions, but they appear to have applied interest from the last day of each four-month period audited from July 1, 2011 to December 7, 2014. (*See* Madeiras Aff. ¶¶ 5, 9.) Presumably, this is because an employer purchases stamps that are valid for a four-month period, and employees redeem those stamps at the end of the four-month period. *See Annuity, Pension, Welfare & Training Funds of the Int'l Union of Operating Eng'rs Local 14-14B v. Integrated Structures Corp.*, No. 12-CV-6354, 2013 WL 4095651, at *7 (E.D.N.Y. Aug. 13, 2013) (explaining stamps process for Local 14). For example, the auditors examined the period from July 1, 2011 to October 31, 2011, and calculated the principal owing during that period. (*Id.* ¶ 9.) They then applied interest on that amount, accruing as of October 31, 2011 and through the date of the audit. (*Id.*) The Trust Agreements specify that the six-percent interest rate applies "from the first day of the month for which such payments are due to the Trustees," but do not identify the month that payments are due to Trustees relative to the work performed. (*See* Welfare Fund Trust Agreement at 11, annexed to Steinberg Aff. as Ex. F.) However, because the interest accrual method applied by Plaintiffs is reasonable and appears to be more generous to Defendant than is explicitly required by the Trust Agreements, the Court accepts Plaintiffs' interest accrual method.

[11] Plaintiffs' six percent rate amounts to $19.87 per day on the $120,897.55 principal, applied over two full years and sixty-three additional days. If judgment is entered after the date of this Memorandum and Order, Plaintiffs are entitled to an additional $19.87 per day on the ERISA principal.

are entitled to interest on the delinquent contributions and are also entitled to statutory damages at "an amount equal to the greater of interest on the unpaid contributions, or liquidated damages provided for under the plan." *See* 29 U.S.C. § 1132(g)(2). The Trust Agreements do not provide for liquidated damages, therefore Plaintiffs are entitled to statutory damages in an amount equal to that of the interest calculated in the section above.

### iv. Attorneys' fees and costs

Plaintiffs also seek to recover attorneys' fees in the amount of $15,793.75 and costs in the amount of $495.00. (Statement of Damages at 1.) A district court must award attorneys' fees and costs in a successful ERISA action that results in judgment in favor of the plan. *See* 29 U.S.C. § 1132(g)(2)(D); *Labarbera v. Clestra Hauserman, Inc.*, 369 F.3d 225, 226 (2d Cir. 2004) ("In that case, the statute renders fees and costs mandatory: 'the court shall award the plan' reasonable fees and costs." (quoting 29 U.S.C. § 1132(g)(2))).

In deciding what fees are due to a plaintiff's attorneys, the Court must consider "what a reasonable client would be willing to pay to determine the 'presumptively reasonable fee.'" *Trs. of Local 813 Ins. Trust Fund v. Bradley Funeral Serv., Inc.*, No. 11-CV-2885, 2012 WL 3871759, at *5 (E.D.N.Y. Aug. 10, 2012), *report and recommendation adopted*, 2012 WL 3871755 (E.D.N.Y. Sept. 4, 2012); *see also Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 522 F.3d 182, 183–84 (2d Cir. 2007). To calculate the amount of a "presumptively reasonable fee," the court multiplies a reasonable hourly rate by the number of hours reasonably expended on the matter. *Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (explaining the "substance of" the traditional lodestar approach and a twelve-factor "reasonableness" approach to determining fees informed the "presumptively reasonable fee" test). When determining whether the presumptively reasonable fee is ultimately reasonable,

a court must "bear in mind all of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorneys' fees . . . ."[12] *Simmons*, 575 F.3d at 174 (internal quotation marks and citation omitted). In what has become known as the "forum rule," courts assess the reasonableness of hourly rates by comparing the rates requested with the prevailing rates charged by attorneys practicing in the district where the court sits. *See id.* at 174–76 (discussing forum rule); *see also Bergerson v. N.Y. State Office of Mental Health, Cent. N.Y. Psychiatric Ctr.*, 652 F.3d 277, 290 (2d Cir. 2011).

---

[12] The Second Circuit has identified a number of variables to guide the inquiry as to what constitutes a reasonable fee, including:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Finkel v. Rico Elec., Inc.*, No. 11-CV-4232, 2012 WL 6569779, at *12–14 (E.D.N.Y. Oct. 1, 2012) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 522 F.3d 182, 187 n.3 (2d Cir. 2007)) (internal quotation marks omitted) *report and recommendation adopted*, No. 11-CV-4232, 2012 WL 6561270 (E.D.N.Y. Dec. 17, 2012). In addition, courts are also instructed to evaluate the complexity and difficulty of the case, the availability and expertise of the client's other counsel, the resources necessary to effectively litigate the case, the timing demands of the case, the attorney's interest in achieving the ends of the litigation and whether the attorney may have initially aced *pro bono*, and other returns the attorney may expect from representation. *Arbor Hill*, 522 F.3d at 184. While the traditional "lodestar" method, which does not consider the above factors, has "achieved dominance in the federal courts," courts in this Circuit continue to take the *Arbor Hill* factors into consideration when determining what constitutes a reasonable fee. *See Finkel*, 2012 WL 6569779, at *13. In any event, determining the "presumptively reasonable fee" and adjusting it based on the above factors produces the same result as applying the traditional "lodestar" analysis in this case.

In reviewing a fee application, courts may review the expenditure of hours submitted by counsel, and adjust to a reasonable amount, as determined in light of the particulars of the case. *Gayle v. Harry's Nurses Registry, Inc.*, No. 07-CV-4672, 2013 WL 5502951, at *7 (E.D.N.Y. Aug. 26, 2013) *report and recommendation adopted*, No. 07-CV-4672, 2013 WL 5502950 (E.D.N.Y. Sept. 30, 2013). To obtain an award of attorneys' fees, a plaintiff must provide contemporaneous time records which support the date work was performed, the nature of the hours expended, and the work done. *See Scott v. City of New York*, 643 F.3d 56, 58–59 (2d. Cir. 2011); *Pilitz v. Inc. Vill. of Freeport*, No. 07-CV-4078, 2011 WL 5825138, at *4 (E.D.N.Y. Nov. 17, 2011) ("The burden is on the party seeking attorney's fees to submit sufficient evidence to support the hours worked and the rates claimed . . . . Accordingly, the party seeking an award of attorney's fees must support its application by providing contemporaneous time records that detail 'for each attorney, the date, the hours expended, and the nature of the work done.'" (first citing *Hensley v. Eckerhart*, 461 U.S. 424, 453 (1983) and then citing *Cho v. Koam Med. Servs. P.C.*, 524 F. Supp. 2d 202, 209 (E.D.N.Y. 2007); quoting *N.Y. Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 48 (2d Cir. 1983))).

Here, although Plaintiffs do not support their fee request with contemporaneous time records, Plaintiffs' counsel has submitted a summary of his time records.[13] Those records reflect

---

[13] Although applications for attorneys' fees generally must be supported by contemporaneous time records specifying "relevant dates, time spent and work done," *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1147-48 (2d Cir. 1983); *Broadcast Music, Inc. v. R Bar of Manhattan, Inc.*, 919 F. Supp. 656, 661 (S.D.N.Y. 1996), courts recognize that "[a]ttorney affidavits which set forth all charges with the required specificity but which are reconstructions of the contemporaneous records satisfy [this requirement] and suffice to permit recovery of attorneys' fees," as do "typewritten transcriptions of the original handwritten time sheets filled out by attorneys . . . ." *David v. Sullivan*, 777 F. Supp. 212, 223

43.25 hours of work at an hourly rate of $350.00 per hour and 3.75 hours of travel at a reduced hourly rate of $175.00 per hour. (Hours Expended by Counsel, annexed to Steinberg Aff. as Ex. W.) The time expenditure for the case appears reasonable in view of the documentation Plaintiffs have provided to support their motion for summary judgment and the time spent making discovery requests and attending conferences while Defendant was active in the litigation. The hourly rate is also reasonable, although on the higher end of the prevailing rate within this district. *See Trustees of Empire State Carpenters Annuity, Apprenticeship, Labor-Mgmt. Coop., Pension & Welfare Funds v. Sanders Constr., Inc.*, No. 13-5102, 2015 WL 1608039, at \*4 (E.D.N.Y. Apr. 10, 2015) (describing $200 to $400 range for partners); *Trustees of the Local 813 I.B.T. Ins. Trust Fund v. Amanda Carting Corp.*, No. 07-CV-656, 2007 WL 4324019, at \*6 (E.D.N.Y. Dec. 7, 2007) (finding that the prevailing rates in the Eastern District range from $200–$375 per hour for partners and $200–250 per hour for senior associates). Plaintiffs' counsel is a partner at his law firm and has been practicing labor law since 1995. His prior rates, between $285 and $325, have been approved within this district for similar work, and counsel asserts that his rates have increased to $350 per hour since January 1, 2015. (Pls. Mem. 21); *see Annuity, Pension, Welfare & Training Funds of the Int'l Union of Operating Eng'rs Local 14-14B, AFL-CIO v. Lori Contracting, Inc.*, No. 14-CV-2467, 2015 WL 1321672, at \*5 (E.D.N.Y. Mar. 5, 2015) (awarding same attorney $325 per hour); *Annuity, Pension, Welfare & Training Funds of the Int'l Union of Operating Eng'rs Local 14-14B, AFL-CIO v. Rice Mohawk*

---

(E.D.N.Y. 1991); *see also Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1160 (2d Cir. 1994) (typed summaries of hours drawn from contemporaneous time records, without submission of actual time records, was sufficient to support attorney's fees application).

*Structural Steel Corp.*, No. 12-CV-902, 2013 WL 1342267, at *4 (E.D.N.Y. Mar. 12, 2013) (awarding same attorney $317 per hour); *Annuity, Pension, Welfare & Training Funds of the Int'l Union of Operating Eng'rs Local 14-14B, AFL-CIO v. Marbro Realty Co.*, No. 11-CV-5722, 2012 WL 3536499, at *5 (E.D.N.Y. July 16, 2012) (awarding same attorney $317.24 per hour); *Annuity, Pension, Welfare & Training Funds of the Int'l Union of Operating Eng'rs Local 14-14B, AFL-CIO v. Star Structural, Inc.*, No. 07-CV-876, 2008 WL 817915, at *3 (E.D.N.Y. Mar. 26, 2008) (awarding same attorney $285 per hour).

Plaintiffs' costs — $400.00 for filing fees and $95.00 for service of process — are also reasonable. (*See* Statement of Damages at 1; Pls. Mem. 22.) Accordingly, Plaintiffs will be awarded the requested $15,793.75 in attorneys' fees and $495.00 in costs.

### v. Interest on non-ERISA deficiency

Finally, Plaintiffs seek prejudgment interest on the delinquent non-ERISA contributions. (Statement of Damages at 1.) Plaintiffs request that the Court apply a nine-percent annual interest rate derived from New York C.P.L.R. section 5004 to an intermediate date between July 1, 2011 and December 15, 2014. (Pls. Mem. 24.)

The Second Circuit permits an award of prejudgment interest for LMRA claims at the Court's discretion and at a rate within the Court's discretion. *See Finkel*, 543 F. Supp. 2d at 162 (citing *Lodges 743 & 1746, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Aircraft Corp.*, 534 F.2d 422, 446–47 (2d Cir. 1975)); *see also Taaffe v. Life Ins. Co. of N. Am.*, 769 F. Supp. 2d 530, 538 (S.D.N.Y. 2011) ("Choosing an interest rate, as noted above is a matter 'confided to the district court's broad discretion.'" (quoting *Sec. & Exch. Comm'n v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996))).

New York C.P.L.R. section 5004 applies a nine-percent annual interest rate for judgments arising under New York law.  N.Y. C.P.L.R. § 5004 (applying a nine-percent annual rate "except where otherwise provided by statute").  Because Plaintiffs seek to recover the delinquent non-ERISA contributions under the LMRA, which allows them to sue in federal court for breaches of state-law labor contracts, the rate under section 5004 is appropriate here.[14]  *See* 29 U.S.C. § 185(a) (authorizing federal "[s]uits for violation of contracts between an employer and a labor organization representing employees"); *see also Brown*, 194 F.3d at 354 (explaining that a lawsuit for failure to abide by a collective bargaining agreement is governed by 29 U.S.C. § 185(a)); *Lanzafame v. Dana Restoration, Inc.*, No. 09-CV-873, 2011 WL 1100111, at *4 (E.D.N.Y. Mar. 22, 2011) ("In awarding interest, a court may look to state law to determine an appropriate rate.").

Moreover, courts in this district regularly apply the section 5004 rate to non-ERISA delinquencies.  *See Bricklayers Ins. & Welfare Fund v. J.K. Merillin Builders, Inc.*, No. 13-CV-1048, 2014 WL 6674404, at *7 (E.D.N.Y. Oct. 6, 2014); *Flanagan v. Marson Grp., Ltd.*, No. 11-

---

[14]  The Court finds persuasive the district court's reasoning in *Alfano v. CIGNA Life Insurance Company of New York*, as quoted in *Taaffe v. Life Insurance Company of North America*:

> [W]hile there is no applicable federal statute establishing a prejudgment interest rate, New York has adopted a statutory prejudgment interest rate of 9%, thus making an objective legislative judgment that 9% is an appropriate rate. Although [defendant] argues that the Treasury rate constitutes a more appropriate rate, there is no reason to think that that rate more accurately captures the time value of money in New York, or the true loss to plaintiff, particularly given the New York State Legislature's determination otherwise.

*Taaffe*, 769 F. Supp. 2d 530, 538 (S.D.N.Y. 2011) (quoting *Alfano*, No. 07-CV-9961, 2009 WL 890626, at *7 (S.D.N.Y. Apr. 2, 2009)).

CV-2896, 2014 WL 4426277, at *5 (E.D.N.Y. Aug. 11, 2014); *Trs. of Steamfitters' Local Union No. 638 v. Nexus Mech., Inc.*, No. 08-CV-3214, 2014 WL 1338377, at *6 (E.D.N.Y. Apr. 2, 2014); *Bricklayers Ins. & Welfare Fund v. Verse Inc.*, No. 12-CV-4271, 2013 WL 4883966, at *7 (E.D.N.Y. Sept. 11, 2013); *Taaffe*, 769 F. Supp. 2d at 538–39; *but see Omega Commc'n Servs, Inc.*, 543 F. Supp. 2d at 162 ("In the absence of an agreement between the parties [regarding the non-ERISA rate], I see no reason to award a higher interest rate to the Non-ERISA Plans than that allotted to the ERISA Plans . . . ."); *Finkel v. Fervent Elec. Corp.*, No. 13-CV-3289, 2015 WL 1469650, at *5 (E.D.N.Y. Feb. 23, 2015) (applying the same interest rate governing ERISA contributions to non-ERISA contributions under the parties' contract). Because Defendant has not disputed Plaintiffs' proposed interest rate and the Court finds it reasonable, the Court awards Plaintiffs nine-percent per year on the outstanding non-ERISA deficiency.

In the absence of a specific interest rate to apply, Plaintiffs' auditor did not calculate interest on the non-ERISA deficiencies. (*See* Final Report.) Because those amounts came due at different times, Plaintiffs encourage the Court to apply an intermediate date as the interest accrual date. (Pls. Mem. 24.) Under New York law, where damages "were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." N.Y. C.P.L.R. § 5001(b). Accordingly, courts in ERISA cases "routinely calculate prejudgment interest from a midpoint date in the delinquency period." *Alston v. Northstar La Guardia LLC*, No. 10-CV-3611, 2010 WL 3432307, at *3 (S.D.N.Y. Sept. 3, 2010) (citing *Finkel v. Triple A Grp. Inc.*, 708 F. Supp. 2d 277, 287–88 (E.D.N.Y. 2010)); *Tr. of the Plumbers Local Union No. 1 Welfare Fund v.*

*Manhattan Plumbing Corp.*, 2009 WL 5821676, at *5 n.4 (E.D.N.Y. Oct. 8, 2009) ("New York law, which federal courts frequently apply in calculating interest in ERISA cases, provides that when damages are incurred over a period of time, prejudgment interest may be calculated from a 'single reasonable intermediate date.'" (quoting N.Y. C.P.L.R. § 5001(b))).

In this case, the delinquency period extended from July 1, 2011 until December 15, 2014. (*See* Pls. 56.1 ¶ 16.) The intermediate date of the delinquency period is March 23, 2013. Multiplying the amount Defendant owed in non-ERISA contributions ($32,690.35) by the annual interest rate of nine percent, and dividing that amount by 365, the daily interest rate on Defendant's non-ERISA delinquency is $8.06. Accordingly, Defendant owes Plaintiffs $11,501.62 in prejudgment interest from March 23, 2013 through the date of this Memorandum and Order.[15]

## III. Conclusion

For the reasons set forth above, the Court grants Plaintiffs' motion for summary judgment and directs the Clerk of Court to award judgment in the amount of $228,417.47 as detailed above and below, and as calculated through the date of this Memorandum and Order:

1. $120,897.55 in principal ERISA deficiencies;

2. $7760.15 in interest on ERISA deficiencies through December 15, 2014;

3. $15,759.45 in interest in ERISA deficiencies from December 16, 2014 through the date of this Memorandum and Order, and an additional $19.87 per day until judgment is entered;

---

[15] If judgment is entered after the date of this Memorandum and Order, Plaintiffs are entitled to $8.06 per day in additional interest on the non-ERISA deficiencies.

4. $23,519.60 in statutory damages and an additional $19.87 per day until judgment is entered;

5. $15,793.75 in attorneys' fees;

6. $495.00 in costs;

7. $32,690.35 in principal non-ERISA deficiencies; and

8. $11,501.62 in interest on non-ERISA deficiencies through the date of this Memorandum and Order, and an additional $8.06 per day until judgment is entered.

If judgment is entered after the date of this Memorandum and Order, the Clerk of Court should add to the ERISA and non-ERISA deficiencies additional per-day interest rates in the amounts identified above.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: February 16, 2016
Brooklyn, New York